Thank you, Your Honors, and may it please the Court. Michael Maiormi, on behalf of Plaintiff Appellant Houston Municipal Employees Pension System, I'd like to reserve five minutes for our briefing. Subject to any questions Your Honors may have, I intend primarily to address the District Court's erroneous holding that the Seeking Alpha articles published in 2015 and early 2016 could not, as a matter of law, constitute corrective disclosures, and not whether the whistleblower complaint filed by BofI's former internal auditor constituted a corrective disclosure, or the other issues on appeal, which we submit can be readily resolved in Plaintiff's favor. As this Court articulated nearly 30 years ago in Hanen v. Data Products Corp., and later expressly applied in the loss causation context in In Re Apollo Group, Inc. securities litigation, what the market is deemed to know or understand regarding particular information depends on the, quote, intensity and credibility with which that information is transmitted. That principle recognizes a distinction between information that is shown to be readily and easily available to investors, and information that is shown to be only discoverable by combing through and analyzing obscure legal or agency documents or similarly esoteric materials. The District Court ignored that principle, instead incorrectly assuming or presuming that information theoretically findable somewhere in the public domain, no matter how esoteric or far-flung it might be, was indisputably known to all market participants because Plaintiff alleged BofI shares traded in an efficient market. We are aware of no Ninth Circuit case ever endorsing that standard. To the contrary, this Court held in Hanen that whether particular information has actually entered the market and been incorporated into the stock price is a question of fact that depends on proof through evidence and cannot be resolved through assumption or presumption. Under the correct standard, which the District Court failed to apply, the relevant question with respect to the Seeking Alpha articles is whether Plaintiff alleged particularized facts to afford a plausible inference that the market did not previously know about or appreciate the significance of the information published in the articles, not, as the District Court reasoned, whether other market participants could theoretically have done the analyses or research the Seeking Alpha authors did, without any factual basis in the record suggesting any other market participant did those analyses or research. Applying the correct standard, dismissal would only be proper if it was plain on the face of the complaint or otherwise through judicially known to and appreciated by the market. The record here supports precisely the opposite inference. Plaintiff has satisfied its pleading burden, consistent with Rule 9b's particularity requirement as this Court examined it in Burson and Gilead, based on the nature of the subject information and the price declines associated with the later disclosure of it. First, Plaintiff plausibly alleges that based on the nature of the information compiled and analyzed for not understood by the market until the Seeking Alpha authors compiled, analyzed, and disseminated it. And the way we would know that is just by what? On the day the article appeared, the stock dropped by a, you know, on high volume or something? I mean, how would you measure that? Yeah, that is, at the pleading stage, Your Honor, that is the stock drop decline is sort of the poll star here, I think. We allege both significant drops, both in absolute numbers and as percentage declines. And in addition, they're in response to particular, these blog posts are referred to as articles, I guess. But that's what I just can't remember. Like when the, you know, November 5th, whatever article came out, you track a corresponding decline in the stock price? Precisely. And an immediate decline, Your Honor. With respect to each one? With respect to each one. Okay. With respect to each one. And is that, that's how we know that the market hadn't previously absorbed the information that was disclosed? Is that? Well, that's an indication that the market did not previously know that information because it indicates that the market was not previously aware of this, that it is new to the market and had not previously been incorporated in a blog post. In your view, does it matter that these blog posts were anonymous? No, it doesn't, Your Honor. It's the information that is disseminated in the blog posts that is important. On that point, in the case, In re Bank of California, securities litigation of Judge Guilford of the Central District, addressed this very argument that because the blog post there, which incidentally was by the same Seeking Alpha author, Aurelius, as a couple of the blog posts here are, that it had to be discounted because it was simply the opinion by an anonymous author. And the judge said, no, that's not the case. There's no requirement, particularly in Dura, for instance, of where the information comes from, from whom the information comes. Although, with regard to the Earhart complaint, you're saying the exact opposite, that because we know who it's coming from and what he says, that that's why it's more than just a mere announcement of an investigation. Well, who it comes from or from where it comes from can help determine the intensity or credibility with which the information is transmitted in the market. Of course, the Earhart complaint is a separate issue than whether the information was previously known to the market, which the Seeking Alpha author or issue presents. So yes, it can bear on the credibility and intensity with which the information is presented. But just because something is anonymous, these are, as we understand it, widely followed blogs. And these are people who have done a significant amount of research to come up with the information that's presented on it. There's nothing to suggest that an opinion, I mean, after all, as Judge Kethledge commented in the community health decision, again, this was based on a whistleblower complaint, but I think it applies equally here. I mean, all factual representations or almost all of them, to some extent, involve some level of opinion. Analyst reports, even admissions in court and complaints. The question is, you have to weigh each one on its facts. And that's why this comes down to a very fact-specific issue that's not resolvable on a motion to dismiss. Assume for this hypo that this case has stayed for three years for whatever reason, and the stay is lifted. During that time, the SEC doesn't take any action. BFI never restates its results. In the Earhart complaint, the trial, he loses. Would the Seeking Alpha article still be considered a corrective disclosure in that hypothetical? Yes. Why would it be? I mean, then wouldn't any blogger or any anonymous person can go on a website, Seeking Alpha, make some allegations, excuse me, and a company's stock price drops, and it's never vindicated? I mean, isn't that ripe for abuse by short sellers? Well, at the end of the day, we have to prove that the market was defrauded. So here we're only at the pleading stage, of course. At the end of the day, you have to prove that defendants made a materially false statement. But as a practical matter, I mean, if you pass the pleading stage, these cases settle. So I mean, isn't that something potentially problematic if just something anonymous blog posts, which is never verified in some other way? Well, I think it's, I would take the opposite view that the danger in discounting information simply because it comes from a blog post and hasn't been necessarily, at least yet, confirmed by an internal company investigation or regulators who have a lot of things to do and may not proceed against the company for all sorts of reasons. You don't need that kind of confirmation just to have a securities claim. In fact, what defendants are trying to do here is say, well, this case is an outlier because we didn't find anything wrong in our internal investigation, and regulators haven't brought any cases or had any actions against us based on what Ehrhardt is alleging. And so our auditors have given us clean opinion, so there's nothing wrong here. There's no securities fraud. Well, that really, I think as Judge Alsop made the point in the LDK Solar case, it sort of has a Fox guards the chicken house quality to it that would defang the securities laws. The relevant question is, and this, Judge Easterbrook references this, and Schleicher be went in 2010. The question is whether or not the facts in the, there was what the market knew, what investors were told versus what later disclosures revealed to them, and whether the market as of that time, it can be said that the market as of that time had been misled as to a material fact. It doesn't matter that someone else confirms it or not confirms it later. It's what the market believes. And at the pleading stage, we only have to plead plausibility. But then, of course, later you would adduce proof of this. At trial, you would see what market makers, you could subpoena and then have, testify market makers, analysts to see what they interpreted as the meaning of disclosures in the market at that time. And so it's not that we just get a free pass and say, oh, here because a short seller made a comment and has its own reasons for making these comments that we automatically get to a win here. I guess I'm just confused as to your position on where we would draw the line, because I guess I understood our prior cases to suggest that there needed to be some kind of complex analysis or some kind of specialized knowledge that the, whoever the author, let's say, of one of these blog posts is relying upon. And it's beyond the can of just an ordinary investor. And that's sort of how we know that the market hadn't previously absorbed this information. I assume that you're not saying that anytime somebody just does some really basic, a few Google searches and put something together in an article and puts it out, and the stock goes down that day. I assume you're not saying that that is going to be sufficient as a corrective disclosure, right? Well, I had two points. First, on the jurisprudence that Your Honor mentioned, it's actually not the case that it is only the situation where if you have a complex piece of data, such as in the Amadeus's case or something like that, or perhaps in Gilead where there's the FDA warning letter, right, not appreciated by the full market. That is one category. The other category, though, is as Hannon makes abundantly clear, it doesn't have to be some specialized piece of information. Hannon, it was, there was an SI-480 printer. The company allegedly made false and misleading misrepresentations about it. When the printer was introduced to the market, there were industry analysts that said there were problems with this printer. The court then, the district court, granted summary judgment saying that that information was known to the market. And so it could not be that misrepresentations by the company with respect to the SI-480 were incorporated into the market price. The district court reversed that, saying that this is a situation of proof through evidence. You can't just assume that there was nothing that the defendant showed in that context. That was where they had the burden of proof. But there was nothing that they showed that indicated that the market widely knew of this, that it was newspapers or in, you know, otherwise widely disseminated. And so that is a key case here. And I think that the Bank of California case also holds that principle. Yeah, okay. But help me, though, understand, we have to draw a line if we were to rule in your favor. Because, again, would you concede that if somebody just presents some very basic analysis that, yes, somebody's put together A, B, and C, but, I mean, my goodness, it was those three pieces of information were out there. They weren't hard to find. You didn't need any specialized knowledge to synthesize them. I assume you would say that that can't count as a corrective disclosure, right? So if that's true, if you're going to say yes, then help me understand, well, where is the line between that and what you see in this case? Right. Yeah, I think that there is, it's always fact dependent. But I'll grant your honor that in a case where, such as some of the cases at Defendant's site, the Blue Earth case, I think, where the author said, well, I could find this within a minute on Google or something, and it wasn't a particularly sophisticated analysis, it may be harder to allege plausibility there that the market didn't previously know of this. And so, you know, it wasn't baked into the market price yet. I mean, I think it's always going to be a question of fact that in that case, you know, the defendants may have a better argument that it's not plausible that the market wasn't previously aware of that. So the plausibility really element here is the line. And it is sort of a, it's a case-specific determination. I mean, only in the rare case, I think, can it be determined at a motion to dismiss. And this court's decision in Gilead is clear on that, that even the judge's, district judge's skepticism about the plausibility of the allegation, about the lack of knowledge, typically is going to be not always, there will be the occasional case. I mean, if it's something on the, you know, the New York Times, the front page of the New York Times, I think it's going to be a hard case to make that it wasn't plausible, that it was plausible that the market didn't already know about it. And your view here is that it just, it was the, I guess, the time-intensive nature of the fact-gathering that these bloggers engage in, is that what makes it so that we can't just We talked about the stock price reaction, which is one objective criterion, I think. And these are both all meaningful, immediate price reactions, which indicates that the market didn't previously know this information. But the other is the nature of the information and the analyses that the Seeking Alpha people did. I mean, for instance, in the August 28, 2015 Seeking Alpha article, the author says he poured over hundreds of loans BFI had written, had conversations with over the previous few months. You know, that stuff that it's, there's nothing in the record to suggest that anyone else had done that. And that is, you know, we think those are pretty extraordinary measures that the Seeking Alpha author kind of collected this information, which in its native state, you know, one loan document by itself may not really raise anyone's interest, right? But if you're looking at hundreds of them and making a conclusion based on that, BFI's practices, that is something that's also new information to the market. The compiling and analyzing of that information is relevant. Investors would not have appreciated the significance of that information previously. And that's, you know, we have plausibly pleaded that. Again, that's something that we're going to have to prove at trial. But we think we've plausibly pleaded that. So it's essentially the nature of the information and the extensiveness, I think, with which the authors analyzed it and compiled it and then ultimately disseminated in their articles. Unless your honors have anything else I'd like to reserve the rest of my time. Yes, we'll give you some time. Yes. Let's hear from counsel for the defendants. Good morning, your honors. May it please the court, John Stege from Shepard Mullen, representing the defendants' appellees. I'd like to help your honor draw that line. And I will do so by demonstrating that the plaintiff's appellants have gotten the law completely wrong, both substantively and procedurally. Let me start substantively, if I might. Let me read a quote from a Ninth Circuit decision. Footnote one, quote, the price in an open... What decision? Footnote one of what? I'll tell you. I was holding that for... Okay. Okay. Suspense. Bearing the lead. Okay. The price in an open and developed market usually reflects all available information because the price is an outcome of competition among knowledgeable investors. Nuveen, your honor was on the panel in Nuveen, and it is one of the many loss causation cases that, of course, populate the Ninth Circuit. So the starting point is the basic versus Levinson fraud in the market theory, right? It's quoted... Nuveen was quoting a Seventh Circuit decision, the Eckstein case. The point is, the starting point substantively is that in an efficient market, the stock price incorporates all publicly available information because of that competition of investors to go ferret that information out, go find it. That's a bedrock principle under basic. And now to help with drawing the line, it establishes a legal presumption from the beginning of the case, including the pleading stage, that the stock price incorporates all publicly available information. Okay. What do we do with that presumption? The existence of that presumption at the starting point of the case means that the plaintiff, in order to rebut that it's not a plausibility standard in the normal sense, because this court's decision in Oregon Public Employees versus Apollo says it's a 9b standard. So what needs to happen? The plaintiff would need to plead facts explaining why in this case, the stock price in an efficient market did not incorporate all publicly available information. Now, how many facts are enough? So yes, but I guess this is what I'm confused about. It seems to me somewhat circular. We start with that presumption, but then if let's say they're able to show, not this case, but in a hypothetical case, one of these seeking alpha articles comes out and the stock drops by 50% that day. And there's just no other explanation in terms of other market forces or other information about the company that would explain why in the hell did the stock just lose half its value. In that scenario, even if that publicly available information, don't we have to assume that, my goodness, the market must not have been aware of the synthesis that's been presented because look at the stock drop. So the question is, is there synthesis? And that comes back to Amadeus and Gilead. And the issue there, though, again, come back to the procedure, the standard. What does the plaintiff need to do to overcome the presumption and get into that world? Well, the plaintiff needs to plead facts. And we also know, by the way, from Metzler in this circuit, that a plaintiff's assertion that something was a corrective disclosure is not a fact. It's an inference. And therefore, in Metzler, the court rejected the assertion that a particular disclosure was corrective because there were needs to plead some facts under 9b, pretty familiar standard in this court, not even PSLRA. We're just saying 9b. And so what did the plaintiffs plead here? Zero. And by the way, the district court pointed that out in the granting of the motion for judgment of the pleadings, gave plaintiffs a second chance, and when they came back, they still pleaded zero. I mean, it's not zero. I don't know what you're looking for there. They explained why they thought this information, given the difficulty of gathering it and the time-intensive nature of that, why they think that means the market hadn't already become aware of that. They didn't actually allege that in the complaint. That was what they argued on appeal. And I'll address that in a second. But the complaint, as the district court probably held, didn't allege facts. It parroted the Gilead verbiage. And by the way, Gilead's pre-9b when the court shifted that in Oregon. But how many facts would have been necessary? I don't know. What I do know, it's more than zero. Now, okay, now let's come to what they argued on appeal. So that raises an interesting question. How hard was it to find the information? But I come back to BASIC, BASIC v. Levinson. BASIC v. Levinson establishes the presumption simply by basis of the availability of the information. Not the publicity, but the availability of the information. Now, how do we know that? How do we know that other than even the language of the case? Cast your mind back to 1988 when BASIC came out. And BASIC established this Google, you could go online and find a 10K. In order to find a 10K, you had to go to Washington or pick up the phone and call the company. The information available to the average investor in 1988 of stuff we now know, and SEC filing, for goodness sake, is going to be incorporated publicly in the stock price quickly, is now a mouse click away. So let me come back to it from a procedural posture as well as substantive. The fact that these court records and real estate filings, all publicly available, every blogger admits all publicly available, easily to get at, doesn't change the fact that the presumption exists that all of that information was already incorporated into the stock price. Again, legal presumption, easily reliable. So go back to the hypothetical I posed in which the article comes out and the stock drops by 50% that day, articles based completely on publicly available information. In that scenario, I guess you would concede that, my goodness, I guess even though in theory, market players, market investors could have obtained this information, they must not have because look at the reaction on that particular day, no? Well, here's what I say. If the plaintiff could plead facts demonstrating the complexity of the information, not whether the information was sufficiently disseminated, but whether it was sufficiently complex that it required some additional expertise. Why? Why when we see the dropping? That's the case law, but... Not our case law. I'm asking you because we're going to, I mean, I don't know what we're going to do in this case, but it seems to me we're going to have to chart a little bit of new ground here. I'm just trying to figure out, so can you help me with the 50% drop? All right, so that's to get there. Okay, so the 50% drop, the stock price drop itself, Apple Computer and many other cases are going to say a stock price drop, Amgen, for goodness sake, Supreme Court, stock price drop is not indicative necessarily of materiality or anything else in and of itself. A little bit more than that. So I come to the Meyer v. Green case, 11th Circuit case that talked about what's the impact of an analyst opinion on publicly available information. So if the information is presumed to be publicly available, the only thing new that comes out in that Seeking Alpha article that results or is correlative to a stock price drop is that analyst's or that blogger's opinions, speculation... No, not opinions, synthesis. Or synthesis. Bringing something together, just as your opponent said, like by itself, this one loan document, okay, that doesn't mean anything. But if somebody spends a month going through hundreds and thousands of files and says, here's the results of my analysis of all that, that's new, right? Even though in theory, everybody could have done, anyone could have done that, everybody could have known that. If there is analysis, right? So again, the plaintiff need to plead facts demonstrating that there is analysis in there, or is it just speculation and opinion? Now we get to look at the Seeking Alpha articles. I encourage your honors to do so. You will see that they are not the kind of professional and analytical articles that connect dots and demonstrate some specific problem never disclosed. They invite the public to draw their own conclusions. They specifically say, we have no particular expertise in these areas. So okay, did the plaintiffs meet that burden under 9b to say this falls within an exception to rebut that presumption? And if they can't, all you're left with for purposes of loss causation, for what the speculation unique to that blogger. Now, what does that tell you if the stock price drops pretty significantly or at all? It starts to put the case much more in the nature of Curry or Metzler or Luce, where the market reacts to the possibility that these issues being talked about by the blogger could have an adverse consequence to the company. I want to talk more generally about rule 9b, the particular requirement. I mean, the purpose of it is to give defendants notice so they know what they're facing. So I can understand why a vague SEC announcement of investigation doesn't meet that requirement, because typically there are one or two paragraphs saying investigation to revenue recognition. Here, you have a lot more details. The Earhart complaint, the alpha, seeking alpha articles, lot more than a two paragraph, you know, SEC press release or an internal company announcement. So why aren't all the details sufficient to meet rule 9b? Well, rule 9b is both intended to give notice, but it also applies in fraud cases. It's intended to put some burden on a plaintiff not to make accusations of fraud in the absence of having facts. So it's a little broader than just notice. That said, we have specificity on what the bloggers said, putting aside that they're anonymous. We also have specificity that the bloggers are short in the stock, so we know that they have a motive. And so investors can look at that. Sure. And they can react to that. And they can react to, what does this mean to the stock in the future? Maybe it means that there's all sorts of misconduct going on that's going to result in some adverse action at some point, because the bloggers aren't reporting adverse action. They're reporting facts that someone could think might lead to adverse action. They're by short sellers, so there's also communicating the possibility of a short attack. There's a lot of confounding information that Dura Pharmaceuticals cautioned us on as to what we need to see in terms of a corrective disclosure. Coming back to rule 9b, what would the plaintiff need to plead? Not just here's the face of the article, but also what is it about that article or the blog post that falls within the expertise and the analysis that Amadeus or Gilead or some of the other cases will say is an exception to the general rule and the presumption that the information is already public and digested in the stock price. So with respect to 9b, maybe it collapses because we can take judicial notice of the blog articles and see on their face they don't meet that standard. How about the revelation that through FOIA request that there was an SEC investigation? I mean, is that really publicly available? I mean, it's a fact that obviously exists, but that seems a little bit different from information that you can get from SEC filing a 10-Q or whatever it may be. I mean, this seems you're going beyond that you have to now file FOIA requests with SEC and figure out there's an investigation. That seems a little bit beyond your typical publicly available knowledge. You've previewed the appeal from the follow-on class action. The district court held that a FOIA request, meaning it's a person can, yes, you have to write a letter and get the information, but you are still a member of the public. And it is presumed again that market participants in an information hungry market is going to do what it can to get information. Now, specifically, we haven't talked at all about another critical flaw here, which is that the disclosures don't match up with the alleged false statements, right? Putting all that aside, the problem with this SEC FOIA request issue is that plaintiffs pointed to no affirmative statements that were rendered false by the existence of an SEC investigation where there are no allegations that the company was even aware of it at the time. And we talk about that at the end of our brief. I see that I'm getting close to the end here, but I want to make sure we've addressed all the issues. But I do think it's important, because we haven't talked about it, that even with all of these issues we've discussed, there is still a lack of congruence between the corrective disclosures and the alleged false statements in those three categories. Let's say I do want to mention here a little big picture. The private right of action of the federal securities laws is one aspect of a much broader federal regulatory and legal regime that addresses securities generally and security fraud. The private right of action, the Supreme Court has held this course on, is the remedial piece of that. It's not the entirety, okay? As a remedial piece of this, it is designed, as Dura Pharmaceuticals made clear, to provide a remedy in an appropriate case where a loss has been caused by a fraud, a fraud that has been disclosed by the relevant truth, a fraud that has been ferreted out by others, not necessarily by folks seeking the remedy. The federal securities laws provide all sorts of other mechanisms for the ferreting out of fraud, for the deterrence of fraud, whether it's Sarbanes-Oxley in terms of requiring independent directors, audit committees, auditors, etc. So the concern that if the plaintiffs in private right of action federal securities litigation don't have the ability to jump the gun and attack a company when there are blog articles, anonymous blog articles by short sellers or disputed allegations in an employment lawsuit is somehow an injustice, it is not. The remedy would exist in an appropriate case and there's no reason to expand the law here to to allow a plaintiff to jump the gun given the policies of the PSLRA, etc. That was a very nice sum up, but I actually had another question for you that related to the topic that your opponent decided not to address. I saw the light and wanted to get to it. No, that was well done, very well done. But what's the person's name, is it Earhart? Just maybe in a nutshell, what is the defect with relying upon his allegations as a corrective? Is just his position? For example, if it had been the CFO of the company had walked out in front of the company and said, I've just resigned, there's all sorts of rampant criminal conduct going on, let me tell you all about it. And so then you don't have the incentive of trying to bring a lawsuit to get money, just makes this announcement. Is that the problem that we have this lower level person and he's doing it in the context of a lawsuit or what? Sure. So here's how I would address that. And I'll use the Curry decision that your Honor was on as a good analogy, partially because the district court relied on Curry in reaching this conclusion. As in Curry, you have allegations of various acts of wrongdoing reported to the government. So in March of 2015, Mr. Earhart reports all of these allegations to the SEC and to the OCC. In Curry, they were reported to the FTC. A couple months later in Curry, the Wall Street Journal publishes that information, stock price reacts, the court holds that's not a corrective disclosure because it only is disclosing the risk that those complaints would lead to a problem in the future. And by the way, the only case I've ever seen where the risk never took place was Curry. Here, instead of in the Wall Street Journal, it comes out in a lawsuit. Now, the market would react to that just like the Wall Street Journal article by saying, well, these allegations could lead to an adverse action, whether it's an adverse action. So it doesn't matter in your view what the person's position was or how specific the complaint. As long as it's a former employee and it's a complaint about wrongdoing, it can never be enough. No, I'm not going that far. So where would you draw the line so you're not going that far? What would you add to my hypothetical or just subtract from it? Sure. So what I'll tell you, the hypothetical, the closest case we have to what you're going to describe, I think was the LDK case, which is Judge Alsop out of the Northern District, yeah, before 9B. So it's not, it may not still be good law in this regard. There you had a higher level whistleblower, right, the controller. And as the court points out, you have and an analyst report and a whole bunch of other things to go with it, right? And, and I think this is the most important part, there was exact congruence between what the whistleblower was disclosing and the alleged false statements in the securities case. You don't have that here with Mr. Earhart. And I'm sure your honors have read the, the, it's about 13 or 20 or so isolated instances of what he perceived as some sort of wrongdoing. Most of them were the possibility that this would lead to fines or violations in the future. It wasn't necessarily identifying actual violations. Some of it was water cooler gossip, but none of it renders false the statements challenged by the plaintiffs in this case. The closest are the internal control questions. But what I'd say is the allegations by Earhart are sufficiently anecdotal, like in Metzler, which doesn't create the corrective disclosure. So is it, so would you say that if we disagreed with you on the congruence that there's enough here? No, I would say that among the other things, I would say there's a problem with congruence, which is the most important. There's also a problem that it's a, a, a person at a lower level in the organization. I mean, no disrespect to lower level employees. I've been a lower level employee. The problem with lower level employees is you don't have the same visibility and expertise as somebody higher up. I don't see why that matters if the person is, is not just reciting secondhand information, but is reciting things that they allegedly themselves witnessed. Who cares if it's the mailroom person? If that person witnessed, you know, conduct that renders some statement that's, that the CEO made false, why isn't that sufficient? So, so putting aside the pleading standard where there's a bit of a different analysis where that, that could get closer to it. Again, I, I, here you have the disclosure in a, an adversarial, in a, in a, in a litigation and, and I would be cautious to, or I would be cautious that if it validates allegations in a, in a lawsuit as creating a corrective disclosure, that it would, it would create havoc because it gives a lot of leverage to adversaries in litigation with public companies to create corrective disclosures. So, you, you, you might, you might well be right there as a policy matter, but it makes it very difficult to determine where you draw the line. Do you eliminate something because it's in a complaint, but you allow it because it's in a press conference where somebody says, but I'm never going to sue? Again, these cases are, are case by case. I hear your Honor suggesting a hypothetical and I don't want to, and the court has been very clear in saying that it is very cautious about ruling anything out in terms of a theory of loss position or the other. The fact is we have a lower level employee here who made allegations, some of which are hearsay and secondhand, but most importantly, the ones that he even says are firsthand, don't render any of the statements false and, and whether there could be a case where they do, where it's, it's perfectly congruent, which is a requirement by Metzler for loss causation purposes. I suppose potentially that could be the case. That's not the case here. Okay. All right. Thank you, counsel. Thank you. Appreciate the arguments. You'll, we'll certainly be generous in giving you time for rebuttal since we let him go over. Thank you, Your Honors. A number of points. First on Earhart, make no mistake about it. What Mr. Cigi is advocating here and what the district court has held is that no allegations in a complaint, whether by the SEC, whether by a private litigant, any indictment by the that they have latched themselves to the 11th circuit's standard as, as the 11th circuit indicated in Meyer, and then in a later decision Sapsoff, which held that a whistleblower complaint, because it is not essentially a finding of fraud, could not constitute a corrective disclosure. Imagine the policy regime that that would create. I mean, the idea that the securities laws would allow for defendants to get away with securities fraud simply because they didn't admit it, or it wasn't found to be fraudulent. That, that is just absurd, I think. And Mr. Cigi mentioned LDK. It's ironic because the analyst report in that, in that case, I think it was in Barron's, was by an anonymous source. So on the one hand, you say, well, you can't have anonymous sources to be a corrective disclosure. On the other hand, that's how they try to distinguish LDK. They also talk about, he sneaks in a couple of times, this reference to 9B. Let's put to rest this issue of 9B, because he and the judge both have well overstated what 9B implicates in the loss causation context. Judge Lee got it right when he said it's basically about notice. Gilead, Mr. Cigi incorrectly said it's a pre-9B case. The court in Gilead said that, you know, assuming without deciding in that case that we will apply 9B, here's what 9B requires. It requires essentially notice, the pleading of sufficient facts to allow for a plausible inference that there was a loss causation and that the facts, you know, sufficient facts to say that, you know, we, that discovery may bear this out. That's all 9B requires in this context. So their attempt to distinguish cases, a couple of them, as pre-9B is really irrelevant, because the issues here are substantive, not based specifically on 9B. But to the extent 9B is relevant, we satisfy it, because the complaint, Mr. Cigi also said we didn't plead with respect to the Seeking Alpha articles, the sort of elements that would lead to the plausible inference that the market was not previously aware of the information that was disclosed to them. We, of course, do plead that in the sections in our complaint where we say specifically with respect to each category that these disclosures revealed previously information that wasn't previously. I mean, I think his point is well taken. Isn't that just reflected by this request for judicial notice you've given us? I mean, you didn't even provide any of that material, as I understand, to the district court to try to help us understand just how difficult it would be to find all this stuff. Isn't that what the purpose of that filing was? Well, it enhances, I think, the showing that we made in our complaint. I don't think it's necessary to it, because as we were talking about earlier, the nature, the obscurity of the information and their compilation of otherwise, information that otherwise wouldn't have been appreciated by the market, I think, does the job enough with respect to 9B. You don't really, what more do you have to show other than that and that there were appreciable stock declines that the record does not indicate were caused by anything else. Defendants have not provided anything through judicially noticeable facts or otherwise to suggest that these stock declines were caused by anything but the disclosures in these articles. I would say, too, with respect to the basic V. Levinson point, it's misdirection. Both B of I here and Judge Curiel below got this wrong. They're not focusing on the antecedent question, which I think your honors are picking up on, which is, was the information publicly available? If the information is publicly available, meaning known to the market, then yes, the general standard is that it's digested and publicly available was known to the market, and we say that we have plausibly alleged that it was not. If they were right about their reading this conflation of basic and this antecedent question, Hannon and Apollo, which Mr. Steegey didn't mention once, couldn't have been decided the way they were. Hannon, it was not about, it was all about information that was already, it was in the public domain, but the case couldn't have come out as it did if it were in the public domain, the market had fully digested it. Apollo, even more so, and I recognize the 2010 ruling, it's the memo opinion, but that case dealt with, there was actually information that was disseminated in newspaper articles that then was reported by a UBS analyst who then issued a negative stock rating. And so the court there, even after a trial record, said that the Ninth Circuit reversed the judgment as a matter of law for defendant on that, saying that you couldn't say, a reasonable jury couldn't find that that UBS articles added something to the market that wasn't previously known. And the court specifically there used Hannon in the context of loss causation. So I think it's pretty clear that the law in this circuit is in our favor. On the relatedness point, I think also both defendants and the district judge got it wrong. They asked for mirror image disclosures, essentially. We allege that even with respect to the narrow set of internal control and compliance representations that the court ruled were actionable, those relate to, okay, the staffing and funding of internal controls and compliance infrastructure, but there is a connection between that and disclosures that indicate that the internal control and compliance infrastructure was deficient. Otherwise, why would the market, why would investors care about staffing of internal controls and compliance infrastructure if the implication was not that these, the internal controls and compliance infrastructure are sufficient? Also, we have a number of additional representations that we've added in the Third Amendment complaint that the district court did passed on the question whether they are actionable. They don't just relate to the staffing and funding of internal controls and the CEO and CFO's representations that they had actually, that they were satisfied with the sufficiency of those controls. The court didn't pass on whether those were actionable. Defendants don't seem to contest that, actually, on appeal. We ask that the court, this court, rule on that question to the extent it thinks it's necessary, rather than just remanding that back to the district court. Okay. Thank you very much, counsel. We appreciate the arguments in this case. The case just argued is submitted.
judges: Watford, Bennett, Lee